IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| **PHYLLIS ANDREWS, ET AL.,** | ) |
| **PLAINTIFF,** | ) |
| **VS.** | )   2:06-cv-1645-RDP |
| **UNITED STATES PIPE AND FOUNDRY COMPANY, INC. and FOUNDRY COMPANY, LLC.,** | ) ) ) |
| **DEFENDANT.** | ) |

**MEMORANDUM OPINION**

The court has before it the June 15, 2009 motion (Doc. #72) of Defendant United States Pipe and Foundry Company, LLC f/k/a United States Pipe and Foundry Company, Inc. ("U.S. Pipe") to clarify or, in the alternative, to decertify claimants' claims of "off the clock" pre/post shift work activities. Pursuant to the court's order of June 19, 2009, the motion (Doc. #72) to clarify or decertify is now under submission and is considered herein without oral argument.

Having considered the briefs and evidentiary submissions, the court finds that U.S. Pipe's motion to clarify or decertify is due to be granted for the reasons outlined below.

**I.   Relevant Procedural History and Facts**

Plaintiff Phyllis Andrews and forty-six (46) others commenced this action on August 18, 2006 by filing a collective action complaint (Doc. #1) in this court for violations of the Federal Wage and Hour Law, 29 U.S.C. §§ 201, *et seq.*, specifically asserting that they were improperly denied compensation for time spent donning and doffing certain personal protective equipment ("PPE"), including boots, hard hats, safety glasses, ear plugs, spats, and fire-retardant uniforms also known

as "greens." (*See* Doc. #1 at 7-9, ¶¶ 14, 18, 19). On August 25, 2006, Plaintiffs filed an amended complaint (Doc. #7) adding numerous opt-in plaintiffs to the lawsuit, and asserting that Plaintiffs are similarly situated because they all "are or have been employed" by U.S. Pipe and are or have been "required to wear personal protective equipment that includes a specialized and unique fire-suit." (Doc. #7 at 5-6, ¶ 6).

The court granted Plaintiffs' motion to facilitate notice on July 7, 2008 (*see* Doc. #45), and on August 6, 2008 wording was finalized on the notice to be sent to potential opt-in class members (*see* Doc. #49; *see also* discussion Section II.A., *infra*). After the class was conditionally certified under 29 U.S.C. § 216(b), another one hundred and thirty-two (132) current or former employees from the four U.S. Pipe plants filed FLSA forms or opt-in notices to join this action.

The parties have now engaged in extensive discovery, including 34 Plaintiffs' depositions, 8 corporate representative depositions, 200 responses to written discovery lodged by Defendant, and numerous Plaintiffs' declarations. (*See* Doc. #72 at 4; *see also* Doc. #84 at 1). The claimants' testimony and discovery responses reveal that, in addition to claims regarding donning, doffing, and walking times, some (but not all)[1] of the claimants are seeking compensation for alleged off-the-clock pre-shift work activities. Those who seek to maintain claims for off-the-clock pre-shift work activities make claims such as the ones below:

---

[1] For example, Melvin Martin, who has held several positions in the melting/casting departments at the Bessemer plant makes no claim for pre/post-shift work activities. (*See* Doc. #73, Exh. 29). Neither do: Brian May, Verba McWaine (Bessemer), Glenn Ray Jones (North Birmingham), Jerome Howard (North Birmingham), Walter Lee, Jr. (North Birmingham), Dwight McCary (North Birmingham), James Miller (North Birmingham), Bertraud Duga (Burlington), or Christopher Hill (Bessemer). (*See* Doc. #73, Exhs. 30, 34, 23, 18, 27, 31, and 35, respectively; *see also* Exhs. 9, 3, and 5, respectively).

Once I arrive at my work station I start the following work in preparation for my shift: I coat the ladle and the chute. The prep work takes about 5 minutes before my shift begins. (Doc. #73, Exh. 19 at 6, Answer No. 5).

Before my shift begins, I start the following work in preparation for my shift: I have to get the blacking water, get the ladle ready, clean the trough, gather my tools and skimming rods, calibrate the machines, and make sure the sand ratio is correct. The prep work takes about 30 minutes and I start before the shift begins. (Doc. #73, Exh. 24 at 6, Answer No. 5).

Before my shift begins, I go to my locker to collect my tools and put on my ear plugs and ear muffs. The prep work takes about 2 to 3 minutes before the shift begins. (Doc. #73, Exh. 25 at 6, Answer No. 5).

I have to get the skimmers together, scrub the trough to get all the iron and powder out. I then dump the trough and apply a new coating to the trough. The prep work takes about 20 minutes. (Doc. #73, Exh. 15 at 6, Answer No. 5).

I get my tools and set them out to be ready when production starts, and gather the blacken. The prep work takes about 2 to 3 [minutes] before the shift begins. (Doc. #73, Exh. 33 at 6, Answer No. 5).

I have to set the machines, get my tools, get the bags up on the machines and perform a dry run on the machines. The prep work takes about 15 minutes before the shift begins. (Doc. #73, Exh. 26 at 6, Answer No. 5).

Before my shift begins, I start the following work in preparation of my shift: I go to the break room and then I go to my locker and get out my gloves. I also have to retrieve my skimmer which is typically already on the line. I do not spend much time prepping because we prep the night before. So when we get to the line, there is already blacken on the line. I put on the ear plugs on the job and that takes about 30 seconds or less. Prep time is 5 minutes …. At the end of the day I get a skimmer and some more blacken (this could take about 5-6 minutes) then I walk to the locker and put my tools up. (Doc. #73, Exh. 39 at 6, Answer No. 5).

Before my shift begins, I start the following work in preparation for my shift: I have a down time sheet that I have to fill out and that takes 2 or 3 minutes. I go get my gloves and safety glasses out of my locker. We wait for them to set the mold. Prep time is 10 minutes. (Doc. #73, Exh. 38 at 6, Answer No. 5).

> I have to get my gloves out of my locker and put them on. You have to get a pan of scrap metal. I also have to do my paperwork, which tells me which pipes I need to make on that particular day. Once I arrive at my work station, prep work takes 20-25 minutes . . . At the end of the day, I gather my tools, drop by my locker on the casting floor, then walk to the clock alley and clock out, which takes 30 minutes. (Doc. #73, Exh. 40 at 6, Answer No. 5).
>
> I have to get my market, my hammer (that I knock the coal out with) and the rake. Then I put the gloves on near the line. Put those squeezable ear plugs takes about 30 seconds. Then I put on a dust mask, safety glasses, and hard hat. I check and make sure everything is supposed to inflate. I also check the readings. Prep work takes around 15 to 17 minutes before the shift begins. (Doc. #73, Exh. 41 at 6, Answer No. 5).

(*See also* Doc. #72 at 14-18) (setting out an account of Bessemer plant plaintiffs' descriptions of the nature and duration of their pre-shift work activities, such as: getting blacking water and powder in a bucket; cleaning windows, getting paper work and oxygen tanks; checking the cable, hoist, turn block, brakes, rack, bridge, and running the crane, putting pans in the oven, getting the castle-bar bag to fill the hoppers, waiting for the crane operator to put powder in the machine).

## II.    Analysis

U.S. Pipe bases the current motion (doc. #72) on two central arguments – first, that the conditional certification did not provide for collective treatment of off-the-clock pre-shift work activities and second, even if it had, those claims are dissimilar so as to warrant decertification. (*See* Doc. #73 at 1). Each ground will be considered in turn.

### A.    Claims for pre-shift work activities were never part of the conditionally certified class.

Plaintiffs seek to maintain claims for pre-shift work activities[2] in this case by arguing that

---

[2] Plaintiffs have made it abundantly clear that they do not now, nor have they ever, sought compensation for any post-shift work other than post-shift walking and doffing of the greens. (*See* Doc. #85 at 19).

4

they have "consistently averred" such activities as part of the collective action. (Doc. #85 at 1). The court disagrees. A thorough review of the relevant procedural history demonstrates that neither the court nor the parties ever envisioned the maintenance of such claims.

The original complaint, filed on August 18, 2006, includes an assertion that Plaintiffs are required to arrive at work "well before the beginning of their shift to engage in certain activities for U.S. Pipe's benefit." A typical day is described as follows:

> arrive at the plant approximately thirty minutes before the shift starts and go to the bathhouse; pick up their issued fire-suits either from the uniform locker, once a week, or their own locker; remove the clothing and shoes they wore into the plant; put on ("don") the specialized protective fire-suit (many employees also put on their own long sleeve and long pants undergarments to protect their skin from the flame retardant chemicals in the suit); don other protective gear including steel toe boots, hard hat, and eye protection; leave the bathhouse, walk to the time clock and punch in; walk to the location where they gather their tools and/or troughs; walk to their work site; put on their gloves; some employees clean the trough they use for their work; and then begin their shifts.
>
> The employees do not receive compensation until their shift begins.

(Doc. #1 at 7-9, ¶¶ 14, 19, 20). The amended complaint includes the same averments. (Doc. #7 at 12-13, ¶ 24). Certainly the generalized reference to "some" off-the-clock pre-shift work activities ("clean[ing] the trough") in the original and amended complaints can not be the nail upon which Plaintiffs hang their collective hats for establishing that those claims had been conditionally certified. Instead, such claims must have been envisioned in drafting the conditional certification itself. But no mention of pre-shift work activities was ever made during the long history of events culminating with the court's certification analysis.

When the court directed the parties to cooperate and confer with each other in December 2006 to move the case along, the only issues the court understood to be relevant for the parties to

consider were the average time a U.S. Pipe employee must spend "donning and doffing the fire-suit that must be worn while performing work, as well as any travel time such employee will incur (a) after donning the fire-suit and before arriving at his assigned work location so that he may clock in for work, or (b) before doffing the fire suit . . ." (Doc. #15 at 1). When the parties could not independently come to an agreement on those points, they sought to rely on a study performed by an independent expert. They did not even hint to the fact that they thought additional pre-shift work activities should be part of the independent reviewer's consideration; rather, they focused on claims related to "individuals who are required to wear flame retardant (Green) PPE's for the entire duration of their shifts . . ." (*See* Doc. #16 at 1, ¶¶ 1, 2).

In April 2007, when the court appointed Lyndel Erwin as Special Master, Mr. Erwin was charged only with the task of determining the "donning, doffing, and travel time of employees wearing the greens." (Doc. #45 at 1). Had court or the parties envisioned claims for off-the-clock pre-shift work to be part and parcel of the case, the Special Master would have been directed to (or at a minimum it seems one of the parties would have requested that he) include in his analysis an average of the time spent by Melting and Casting employees in performing off-the-clock pre-shift work activities. Instead, the Special Master order directed Mr. Erwin only to:

> develop an estimate of the average time that one of Defendants' employees must spend donning and doffing the fire-suit that must be worn while performing work, as well as any travel time such employee will incur (a) after donning the fire-suit and before arriving at his assigned work location so that he may clock in for work, or (b) before doffing the fire-suit.

(Doc. #19 at 1, ¶ 1).

After the appointment of the Special Master, the parties never hinted that additional pre-shift activities were part of this action. On September 25, 2007, Plaintiffs filed an opposed motion to

6

certify a class pursuant to 29 U.S.C. §216(b).  The motion requested that the court enter an order:

> allowing notice to be sent to all hourly employees and former employees of United States Pipe and Foundry who have been required to wear flame retardant (Green) personal protective equipment ("PPEs") for the entire duration of their shifts, which would include, but not be limited to, employees working or who have worked in the Melting and Casting Departments at North Birmingham, Alabama; Bessemer, Alabama; Burlington, New Jersey; and, Chattanooga, Tennessee at any time between August 18, 2004, and the present.

(Doc. #26 at 3).  In support of their motion, Plaintiffs claimed that:

> Defendants require Plaintiffs and other similarly-situated employees and former employees who wear or wore flame retardant (Green) PPE's to work "off the clock" without paying them their proper wages and/or overtime compensation.  (Doc. #26 at 8, ¶ 3).
>
> In particular, Plaintiffs allege that U.S. Pipe failed to pay them and all others required to wear fire-suits for hours worked, including overtime hours, while engaged in principal activities of their employment.  (Doc. #26 at 8, ¶ 4).
>
> Plaintiffs claim that prior to their shift, U.S. Pipe failed to pay them and others similarly-situated for the time they spent putting on their fire-suits and other personal protective equipment, walking to the time clock, walking to the locations where they gather their tools and/or troughs, and walking to their work sites.  (Doc. #26 at 8, ¶ 5).
>
> Plaintiffs further claim that U.S. Pipe failed to pay them and others similarly-situated for the additional walking and changing time they spent at the end of the shift.  (Doc. #26 at 8-9, ¶ 6).
>
> Plaintiffs claim they and other similarly situated employees are entitled to be paid their hourly rate and any overtime due for the pre- and post-shift principal activities.  (Doc. #26 at 9, ¶ 7) (emphasis added).

No where in their motion for certification do plaintiffs delineate claims for pre-shift work activities beyond donning PPE and walking to their work stations.  No mention is made of such activities as coating ladles and chutes, getting blacking water, cleaning the trough, calibrating the machines, and checking the sand ratio.  (*See, e.g.* Doc. #73, Exhs. 15, 19, 24, 25, 36 at 6, Answer No. 5).

7

After extensive briefing and a hearing on Plaintiffs' opposed motion to facilitate notice, *during which no mention was made of additional pre-shift off-the-clock work activities*,[3] the court granted the motion to facilitate notice. (*See* Docs. #26, 27, 28, 37, 43, 44). The parties were ordered to file a joint proposed notice to be issued to potential opt-in class members. (*See* Doc. #45). The parties timely compiled with that order on July 11, 2008; however, the joint proposed notice reflected that the parties maintained disagreements regarding the contents of the proposed notice. (*See* Doc. #46). Again, *no mention was made of additional pre-shift off-the-clock work activities*. In resolving the parties' contested issues, the court issued notice addressed to "all hourly employees and former employees" of U.S. Pipe at any time between August 18, 2004 and the present "who have been required to wear flame retardant (Green) personal protective equipment ("PPE's") for the entire duration of their shifts, which would include, but not limited to, employees working or who have worked in the Melting and Casting Departments at North Birmingham, Alabama; Bessemer, Alabama; Burlington, New Jersey; and Chattanooga, Tennessee."[4]

Finally, during a telephone conference with the parties on June 19, 2009, the court made the

---

[3] Tellingly, the hearing on the motion to facilitate notice focused on three main issues: whether there was a collective bargaining agreement provision executed after the PPE policy, whether employees had the option to don and doff the greens at home, and whether the greens were clothes within the meaning of Section 203(o). (*See* Doc. #44 at 2-3).

[4] The only wrinkle here is that the notice, in describing the lawsuit, states that Plaintiffs allege that U.S. Pipe violated the FLSA by failing to pay them and all other similarly situated employees required to wear the greens "for the time they spent putting on their greens and other PPE; walking to the locations where they gather their tools; walking to their work sites; and *engaging in preparatory activities before they begin their shift*. The Plaintiffs further allege that U.S. Pipe failed to pay them for the additional walking and changing time they spent at the end of their shift." (Emphasis added). Nevertheless, no delineation is made as to claims for pre-shift work activities beyond donning PPE and walking to work stations.

remark that it had not intended to certify claims for off-the-clock pre-shift work – separate and apart from claims of donning, doffing, and walking times – as part of the conditionally certified collective action. Counsel for Plaintiffs did not put up a fight to that remark.

Based on the foregoing history, there is no colorable argument that the parties ever intended claims for off-the-clock pre-shift work activities to be part of the conditionally certified class, nor that such claims were ever part of the conditionally certified class. The certification order is so clarified.

> **B.     Alternatively, the claimants are not similarly situated as to their claims for pre-shift work activities.**

Even assuming, *arguendo*, that pre-shift work activities were part of the conditionally certified class, decertification would nevertheless be proper as to such claims. While pre-shift activities may well be "a critical piece of uncompensated work that falls within the continuous workday commenced by the donning of the greens" as Plaintiffs allege, (*see* Doc. #85 at 1), they are improperly included in this case if trying them along with the donning, doffing, and walking claims destroys the similarities which make a collective action proper. And that they do.

When this court conditionally certified the class, it did so in its discretion after applying the two-part test for certification set forth in *Dybach v. State of Fla. Dep't of Corrections*, 942 F.2d 1562, 1567-68 (11th Cir. 1991).[5] (*See generally* Doc. #45). At that point in the litigation, other employees wished to "opt-in" to the case, and employees were deemed to be similarly situated as to

---

[5] *Dybach* required the court to consider: (1) whether there are other employees of the employer who wish to "opt-in;" and (2) whether these employees are "similarly situated" with respect to both their job duties and pay. *Dybach*, 942 F.2d at 1567-68.

their job duties and pay.[6] (*See* Doc. #45 at 3-4, n.3). Now, however, the stage for review has widened – the "similarly situated" standard on decertification is less lenient than on certification, *Dybach* no longer applies, and Plaintiffs' bear the burden of establishing that all conditionally certified Plaintiffs are similarly situated. *See Anderson v. Cagle's*, 488 F.3d 945, 953 (11th Cir. 2007) (citing *Thiessen v. Gen. Elec. Capital Corp.*, 267 F.3d 1095, 1103 (10th Cir. 2001) (describing the "similarly situated" standard at the second stage as "stricter" than that applied at the first stage and noting several relevant factors courts consider, including "(1) disparate factual and employment settings of the individual plaintiffs; (2) the various defenses available to defendant[s] [that] appear to be individual to each plaintiff; [and] (3) fairness and procedural considerations."),[7] *cert. denied*, 536 U.S. 934 (2002)). While the Eleventh Circuit has not provided guidance to district courts on "[e]xactly how much less lenient" the standard is, "logically the more material distinctions revealed by the evidence, the more likely the district court is to decertify the collective action." *Cagle's*, 488 F.3d at 953.

---

[6] At the certification stage, the court could not say that employees who donned and doffed off-site were not similarly situated to those who donned and doffed on-site because the question of donning and doffing compensability was one of mixed fact and law "dependent upon the application of the three *Bonilla/Dunlop* factors to the circumstances present here." (*See* Doc. #45 at 4, n.3). The parties had not conducted sufficient discovery, nor had they presented a complete record, in order to allow a determination on that issue to be made as a matter of law. (*See id.*) On this pending motion for decertification, Defendant seeks only to decertify claims of additional pre-shift work activities. The company does not seek to decertify the broader class on the ground that some don and doff the greens at work, while others don and doff at home.

[7] The parties do not dispute that these are the relevant factors for the court to consider on decertification. (*See* Doc. #72 at 6; *see also* Doc. #85 at 6).

> **1. The factual and employment settings of the individual plaintiffs who assert claims for off-the-clock pre-shift work activities are disparate so as to warrant decertification.**

The similarities necessary to maintain a collective action under § 216(b) must extend beyond the mere facts of job duties and pay provisions. *See Anderson*, 488 F.3d at 953 ("[A]lthough the FLSA does not require potential class members to hold identical positions, the similarities necessary to maintain a collective action under §216(b) must extend 'beyond the mere facts of job duties and pay provisions.' Otherwise, it is doubtful that §216(b) would further the interests of judicial economy, and it would undoubtedly present a ready opportunity for abuse.") (internal citations omitted). To determine whether the similarities of those Plaintiffs asserting claims for pre-shift work activities are enough to survive a motion for decertification, the court must engage in a fact-specific analysis. *See Morgan v. Family Dollar Stores, Inc.*, 551 F.3d 1233, 1261 (11th Cir. 2008) ("At this point, the district court has a much thicker record than it had at the notice stage, and can therefore make a more informed factual determination of similarity."); *see also Scott v. Heartland Home Finance, Inc.*, 2006 WL 1209813, No. at *3 (N.D. Ga. May 3, 2006) (individualized factual issues should be considered during decertification stage of analysis) (internal citations and quotations omitted)).

At the outset, the court notes that there is no legitimate dispute that all Plaintiffs share the fundamental employment circumstance that forms the basis of this case – they all are required to clock-in prior to the start of their shifts, and are not paid until a pre-determined shift time commences. *See Crain v. Helmerich & Payne Int'l Drilling Co.*, Civ. A. No. 92-0043, 1992 WL 91946, at 3 (E.D. La. April 16, 1992) ("[W]hat matters is the fundamental allegation – that according to company policy the time spent in job related meetings and training was uncompensated – is

'common to all the plaintiffs and dominated each of their claims.'")(internal citations and footnote omitted)). (*See* Doc. #85 at 7). Indeed all Plaintiffs are required to perform *some* work activity prior to the commencement of their shift – donning personal protective equipment and walking to their work stations. (*See* Doc. #85 at 11-12). And once their shift begins, Melting and Casting employees at the Birmingham, Bessemer, and Burlington plants[8] all share the same job functions. As to the Melting employees, all must load raw materials, batch raw materials, melt, de-sulfurize, treat, and transfer the molten metal to the Casting department. (*See* Doc. #85 at 7, 8-9). Casting employees must deliver molten metal, pour metal into machine ladles, cause the metal to flow from the ladles down the troughs, and extract the metal. (*See* Doc. #85 at 7-8, 9-11). Plaintiffs argue (correctly) that with regard to these matters Plaintiffs are similarly situated. (*See* Doc. #85 at 6-20). No one really disputes that point.

But real and material differences amongst the Plaintiffs crop up for those minutes immediately before beginning their shift.[9] Some must clean the trough (*see, e.g.,* Doc. #73, Exh. 15 at 6); some must get skimmers and blacken[10] (*see, e.g,* Doc. #73, Exh. 36 at 6); some must perform a dry run on the machines (*see, e.g.,* Doc. #73, Exh. 26 at 6); some must complete paperwork (*see, e.g.,* Doc. #73, Exh. 38 at 6); some must attend meetings (*see, e.g.,* Doc. #73, Exh. 37 at 6); and some have to get a pan of scrap metal (*see, e.g.,* Doc. #73, Exh. 40 at 6). The time required to

---

[8] This information is not available at this time as to the Chattanooga plant. (*See* Doc. #85 at 7, n. 2).

[9] For the sake of clarity and concision, the court refers to these activities – *e.g.* gathering blacken and skimmers, completing paperwork – as "additional" pre-shift work activities.

[10] Other claimants specifically state: "when we get to the line, there is already blacken on the line." (Doc. #73, Exh. 39 at 6).

12

perform those tasks varies, based on Plaintiffs' testimony,[11] from a low of 2 minutes to a high of 30 minutes. (*See, e.g.,* Doc. #73, Exhs. 19, 24, 25, 28, 33, 36 at 6). It is Plaintiffs' burden to establish that as to those additional pre-shift work activities (the sole subject of the decertification motion), the claimants are similarly situated. *See Cagle's*, 488 F.3d at 953. This they have failed to do.

The undisputed evidence before the court is that not all claimants make claims for additional pre-shift activities. (*See* Doc. #73, Exhs. 3, 5, 9, 18, 23, 27, 29, 30, 31, 35).[12] On a very basic common sense level, Plaintiffs cannot, by definition, be similarly situated if they do not all make the same claims. Of those Plaintiffs who do make such claims, their own testimony reveals materially diverse experiences. (*See* Section I, *supra*) ("I coat the ladle and chute;" "I have to get the blacking water, get the ladle ready, clean the trough, gather my tools and skimming rods, calibrate the machines, and make sure the sand ration is correct;" "I have to get the skimmers ready, scrub the trough and get all the iron and powder out;" "I get the bags up on the machines and perform a dry run on the machines;" "I go get my gloves and safety glasses out of my locker. We wait for them to set the mold;" "I check and make sure everything is supposed to inflate. I also check the readings."). Those diverse experiences reflect, at their very core, different *job duties* which is the most basic of all requirements in the similarity-situated analysis. *See Anderson*, 488 F.3d at 953. And differing job duties, of course, leads to highly variant amounts of time spent in actually

---

[11] Again, the Special Master was not directed to perform an analysis on the amount of time employees spend in preparatory activities beyond donning the greens and walking to the work site. (*See generally* Doc. #19).

[12] Defendant has identified for the court 10 claimants who do not make claims for pre-shift activity work. But it is possible that more claimants fit into that category. Several claimants had not served discovery responses at the time of the filing of the original motion. "Defendant could not have possibly known what these claimants' claims were, much less have identified any specific defenses thereto." (Doc. #92 at 6, n. 3).

performing those additional pre-shift activities. Some claimants spend a mere additional 2 minutes – others claim that their long litany of additional pre-shift work responsibilities require up to 30 minutes of unpaid time to complete. (*See* Doc. #73, Exhs. 25, 28 at 6, Answer No. 5). Since there is no company-wide policy requiring any of these activities to be done prior to the start of the shift (other than, arguably, inspecting the equipment), any requirements regarding whether (<u>and</u> <u>when</u>) those job duties are to be performed varies based upon the individual decision-makers at different plants. And to be sure, there have been different decision-makers (and thus different requirements). (*See* Doc. #72 at 9, 12-18; *see also* Burnham Dep. at 188-89, 190-91). In such an instance, collective action is inappropriate. *See Bernard v. Household Intern., Inc.*, 231 F. Supp.2d 433 (E.D. Va. 2002) (Where the proceeding will "focus on the acts of . . . individual supervisors or managers," a collective action is inappropriate.); *see also England v. New Century Fin. Corp.*, 370 F. Supp.2d 504, 511 (M.D. La. 2005) (denying conditional certification because plaintiff's failure to provide evidence of a nationwide illegal policy shows that the alleged claims are based on "local policies of various managers located at different sites.").

    **2.**    **Various individual defenses**

The differences in factual and employment settings which render the claimants dissimilar on their additional pre-shift claims would also render a communal defense unworkable and improper. Claimants worked a variety of different positions on different shifts and under different supervisors, each circumstance apparently based upon different requirements when it came to performing off-the-clock pre-shift work activities. At trial, U.S. Pipe would need to learn the details of each alleged

14

activity in order to properly craft its defense.[13]  By way of example, for each specific claim that pre-shift work activities went uncompensated, the company would need to discover Plaintiffs' position regarding when the activity was performed, how often the activity was performed, how long it took to complete the activity,[14] who directed the claimant to perform the activity,[15] who supervised the claimant while performing the activity, and whether the claimant ever complained about being required to perform the activity off-the-clock.  Each defense would then be crafted to each individual claimant, making collective adjudication impossible.  *See Mooney v. Aramco Servs. Co.*, 54 F.3d 1207, 1215 (5th Cir. 1995) ("In view of the hodgepodge of claims and allegations, it is clear that the defenses available to [defendant] are just about as disparate as the Plaintiffs themselves.").  The result would be to render the collective action, as to the additional pre-shift claims, " unwarranted or unmanageable."  *Morgan*, 551 F.3d at 1263.

---

[13] Due process assures that collective actions cannot be used to diminish the substantive rights of any party.  "The opportunity to adequately and vigorously present material defenses lies at the very core of the adversarial process and the right to a fair trial . . . [and] may not be disregarded for reasons of convenience of economy."  *Stonebridge Life Ins. Co. v. Pitts*, 236 S.W. 3d. 201, 205 (Tex. 2007) (citations omitted).  (*See also* discussion, Section II.B.3, *infra*).

[14] Representative evidence on damages would be inaccurate and prejudicial to U.S. Pipe.  Therefore, a case-by-case analysis into the amount of time each off-the-clock pre-shift work activity requires would be necessary, again destroying the very foundation of collective actions.  *See England v. New Century Financial Corp.*, 370 F. Supp.2d 504, 511 (M.D. La 2005) ("[D]amages would necessarily require a case-by-case inquiry, thereby rendering it impossible to try this case as a collective action.").

[15] An inquiry would have to be made as to whether each individual supervisor complied with his task of recording whether employees spent time working off-shift.  (*See* America Dep. at 74-75, 84-85, 101-03; *see also* Polyak Dep. at 30-31; Love Dep. at 75-82).  If, through inadvertence, any such times were not recorded, there would be a question as to whether such failure was inadvertent or willful.  *See Gustadfson v. Bell Atlantic Corp.*, 171 F. Supp.2d 311, 322 (S.D. N.Y. 2001) (citing *Brock v. Superior Care, Inc.*, 840 F.2d 1054, 1062 (2nd Cir. 1988)).

### 3. Fairness and procedural considerations

The final factor, fairness and procedural considerations, also favors decertification of any claims for additional pre-shift off-the-clock work activities. The purposes of § 216(b) actions under the FLSA are to: (1) reduce the burden on plaintiffs through the pooling of resources, and (2) efficiently resolve common issues of law and fact that arise from the same illegal conduct.[16] *See Morgan*, 551 F.3d at 1264-65 (citing *Hoffmann-LaRoche, Inc. v. Sperling*, 493 U.S. 165, 170 (1989) (noting a collective action affords plaintiffs the "advantage of lower individual costs to vindicate rights by the pooling of resources" and "[t]he judicial system benefits by efficient resolution in one proceeding of common issues of law and fact.")). Also of import is the broader consideration that the FLSA is a remedial statute which should be liberally construed. *See Morgan*, 551 F.3d at 1265 (citing *Prickett v. DeKalb County*, 349 F.3d 1294, 1296 (11th Cir. 2003) ("FLSA is a remedial statute that has been construed liberally to apply to the furthest reaches consistent with congressional discretion.")).

But those considerations cannot trump decertification where failing to decertify would prejudice a party or become particularly burdensome on the jury. *See Theissen v. Gen. Elec. Capital Corp.*, 267 F.3d 1095, 1105 (10th Cir. 2001) (finding a collective action "impose[d] extraordinary burdens on the jury, both in terms of quality of evidence and the length of trial."); *see also Johnson v. TGF Precision Haircutters, Inc.*, No. Civ. A. H-03-3641, 2005 WL 1994286, at *7 (S.D. Tex. Aug. 17, 2005) ("The Court must also determine whether it can coherently manage the class in a manner that would not prejudice any party.") (internal citations omitted). Here, the court would be

---

[16] On a most basic level, collective treatment of the additional pre-shift work activities is improper because they do not present common issues of fact arising from the same illegal conduct. (*See* discussion, *supra*, Section II.B.1.).

faced with a core donning, doffing, and walking case swallowed and consumed by considerations of whether, for example, (*see* Section II.A., *supra*), "Jane Doe's" supervisor required her to clean the trough every day prior to the start of her shift (and, if so, how long did it take).  The jury would be required to dissect testimony from each claimant regarding her claims, job duties, supervisors, shifts, and plants[17] whereas those aspects are differences with distinction when considered in relation to the donning, doffing, and walking claims.  *See Johnson*, 2005 WL 1994286, at *7 ("individualized claims and individual defenses, all of which are highly fact intensive, would not only dominate but would swallow and consume the entire case"); *see also Hinojos v. Home Depot, Inc.*, No. 2:06-cv-00108, 2006 WL 3712944, at *2 (D. Nev. Dec. 1, 2006) (the need for mini-trials is the "antithesis of collective action treatment and would overwhelm the judicial system and eliminate any judicial efficiency that might be gained through a collective approach.").  The court is confident that Congress did not have any of this in mind when it enacted this remedial statute.

---

[17] As explained by U.S. Pipe:

> [S]ince U.S. Pipe has only had the opportunity to depose 35 Claimants, it would need to call each Claimant at trial to determine whether they are making such a claim, and if so, discern the nature and extent of their claim.  Then, depending on the testimony of each Claimant, U.S. Pipe would have to determine, for the first time, whether to call as a witness the applicable supervisor(s) and/or department manager(s) for the particular time frame at issue for that particular Claimant.  Consequently, U.S. Pipe, without prior warning, could be forced to call each and every supervisor and department manager who worked in the melting and casting departments at the four plants going back to 2003 to speak to the individual claims of each Claimant.

(Doc. #72 at 23-24; *see also* discussion, Section II.B.2, *supra*).

### III.     Conclusion

For the foregoing reasons, the motion (doc. #72) to clarify or, in the alternative, to decertify claimants' claims of "off the clock" pre/post shift work activities is due to be granted. Off-the-clock pre-shift work activities were never part of the conditionally certified class and, even had they been, they should be decertified because as to those claims, Plaintiffs are not similarly situated. A separate order consistent with this opinion will be entered.

**DONE** and **ORDERED** this ___21st___ day of August, 2009.

_____
**R. DAVID PROCTOR**
UNITED STATES DISTRICT JUDGE