**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

| | |
|---|---|
| PHYLLIS ANDREWS; et al., | ) |
| | ) |
|     Plaintiffs, | ) |
| | ) |
| v. | )     Case No.:  2:06-cv-1645-RDP |
| | ) |
| UNITED STATES PIPE AND | ) |
| FOUNDRY COMPANY, INC.; | ) |
| FOUNDRY COMPANY, LLC., | ) |
| | ) |
|     Defendants. | ) |

## <u>MEMORANDUM OPINION</u>

The court has before it the June 15, 2009 motion (Doc. #74) of Defendant United States Pipe and Foundry Company, LLC f/k/a United States Pipe and Foundry Company, Inc. ("U.S. Pipe") for summary judgment.  Pursuant to the court's order of June 19, 2009, the motion for summary judgment is now under submission and is considered herein without oral argument.

Having considered the briefs and evidentiary submissions, the court finds that U.S. Pipe's motion for summary judgment is due to be granted in part and denied in part for the reasons outlined below.

## I.    <u>Procedural History</u>

Plaintiff Phyllis Andrews and forty-six (46) others commenced this action on August 18, 2006 by filing a collective action complaint (Doc. #1) in this court alleging violations of the Fair Labor Standards Act, 29 U.S.C. §§ 201, *et seq.*, specifically asserting that they were improperly denied compensation for time spent donning and doffing certain personal protective equipment ("PPE"), including boots, hard hats, safety glasses, ear plugs, spats, and fire-retardant uniforms also known as greens.  On August 25, 2006, Plaintiffs filed an amended complaint (Doc. #7) adding numerous opt-in Plaintiffs to the lawsuit, bringing the number of named and opt-in Plaintiffs, after

court approved notice, to two-hundred seventy-two (272).  Of those two-hundred seventy-two (272), thirty-five (35) maintenance employees, three (3) core room employees, four (4) supervisors, and twenty (20) individuals who failed to comply with discovery were dismissed by the court on August 5, 2009 pursuant to Defendant's motion to dismiss certain claimants from the conditionally certified class.  (*See* Doc. #99).  All remaining Plaintiffs continue to maintain that they have been unlawfully deprived of their wages.[1]

Defendant's June 15, 2009 Motion for Complete Summary Judgment (Doc. #74) asserts that no genuine issue of material fact exists and that U.S. Pipe is entitled to judgment as a matter of law as to all claims asserted against it.

The parties have each filed briefs and submitted evidence in support of their respective positions concerning the pending motion for summary judgment.  On June 15, 2009, U.S. Pipe submitted evidence[2] (Docs. #75, 77) in support of the motion and also filed a supporting

---

[1]  The court has ruled that claims for off-the-clock pre-shift work activities – exclusive of donning and doffing, and walking time – were never part of the conditionally certified class and, even had they been, decertification was proper because as to those claims, Plaintiffs are not similarly situated.

[2]  Defendant U.S. Pipe submitted: *Allen v. McWane, Inc.*, Civ. Action No. 2:06-cv-158 (E.D. Tex. 2008), Order and Rule 54(b) Judgment (Exhibit A); conditional certification hearing transcript – Doc. #44 (Exhibit B); Fair Labor Standards Act, U.S. Department of Labor, Wage & Hour Division Advisory Opinion Letter No. FLSA2002-2 (June 6, 2002) (Exhibit C); Fair Labor Standards Act, U.S. Department of Labor, Wage & Hour Division Advisory Memorandum No. FLSA2006-2 (May 31, 2006) (Exhibit D); Fair Labor Standards Act, U.S. Department of Labor, Wage & Hour Division Advisory Opinion Letter No. FLSA2007-10 (May 14, 2007) (Exhibit E); the sworn deposition testimony and attached exhibits of Adrian Adams (Exhibit F1); the sworn deposition testimony and attached exhibits of Phyllis Andrews (Exhibit F2); the sworn deposition testimony and attached exhibits of Mark Anthony (Exhibit F3); the sworn deposition testimony and attached exhibits of Duane Barnes (Exhibit F4); the sworn deposition testimony and attached exhibits of Roderick Burrell (Exhibit F5); the sworn deposition testimony and attached exhibits of Robert Colter (Exhibit F6); the sworn deposition testimony and attached exhibits of Robert Craig (Exhibit F7); the sworn deposition testimony and attached exhibits of Marlon Crawl (Exhibit F8); the sworn deposition testimony and attached exhibits of Ernest Cunningham (Exhibit F9); the sworn deposition

memorandum brief (Doc. #76).   Plaintiffs submitted evidence[3] (Doc. #83) in opposition to the

_____

testimony and attached exhibits of Tanya Davis (Exhibit F10); the sworn deposition testimony and attached exhibits of Winfred A. Davis (Exhibit F11); the sworn deposition testimony and attached exhibits of Bertaud Duga (Exhibit F12); the sworn deposition testimony and attached exhibits of Tyraus Farmer (Exhibit F13); the sworn deposition testimony and attached exhibits of Christopher Hill (Exhibit F14); the sworn deposition testimony and attached exhibits of Leroy Lassiter (Exhibit F15); the sworn deposition testimony and attached exhibits of Melvin King (Exhibit F16); the sworn deposition testimony and attached exhibits of Audrey Long (Exhibit F17); the sworn deposition testimony and attached exhibits of Corey Maye (Exhibit F18); the sworn deposition testimony and attached exhibits of Verba McWaine (Exhibit F19); the sworn deposition testimony and attached exhibits of Douglas McIntosh (Exhibit F20); the sworn deposition testimony and attached exhibits of Jansen Murray (Exhibit F21); the sworn deposition testimony and attached exhibits of Joseph Penick (Exhibit F22); the sworn deposition testimony and attached exhibits of Tyronne Rudolph (Exhibit F23); the sworn deposition testimony and attached exhibits of Gene Sims (Exhibit F24); the sworn deposition testimony and attached exhibits of Andrew Small (Exhibit F25); the sworn deposition testimony and attached exhibits of Anthony Speight (Exhibit F26); the sworn deposition testimony and attached exhibits of Alfonso Stevens (Exhibit F27); the sworn deposition testimony and attached exhibits of Sammy Townsend (Exhibit F28); the sworn deposition testimony and attached exhibits of Joel Valme (Exhibit F29); the sworn deposition testimony and attached exhibits of Barry Watford (Exhibit F30); the sworn deposition testimony and attached exhibits of Byron Watkins (Exhibit F31); the sworn deposition testimony and attached exhibits of Will Walker, Jr. (Exhibit F32); the sworn deposition testimony and attached exhibits of Jimmy Warren (Exhibit F33): Plaintiffs' sworn answers to Defendant's Request for Admission and Interrogatories (Exhibit G); the sworn declaration of Paula Polyak and attached exhibits (Exhibit H); the sworn declaration of Michael A. Love and attached exhibits (Exhibit I); the sworn declaration of Charles W. Hardin and attached exhibits (Exhibit J); the sworn declaration of Scott Cohen and attached exhibits (Exhibit K); the sworn declaration of Jim America (Exhibit L); the sworn deposition testimony of Michael A. Love and attached exhibits (Exhibit M); the sworn deposition testimony of Paula Polyak and attached exhibits (Exhibit N); the sworn deposition testimony of Jim America and attached exhibits (Exhibit O); the sworn deposition testimony of Michael Burnham and attached exhibits (Exhibit P); the sworn deposition testimony of William Yarbrough and attached exhibits (Exhibit Q); the sworn deposition testimony of Scott Cohen and attached exhibits (Exhibit R); the sworn deposition testimony of Charles Hardin and attached exhibits (Exhibit S); the sworn deposition testimony of Special Master Lyndel Erwin and attached exhibits (Exhibit T); and the affidavit of Kenneth Kilbane – document 40-3 (Exhibit U).

[3] Plaintiffs submitted in opposition to summary judgment: the Expert Report of Lyndel Erwin (Exhibit 1); December 11, 2006, mandatory "greens" requirement memorandum for Northern Birmingham (Exhibit 3); Bessemer Safety Manual General Safety Rules 6.01 (Exhibit 5); American Foundry Society Guide for PPE for Foundry Operations (Exhibit 7); April 2004 PPE FRC policy (Exhibit 11); 12/10/03 S. Cohen memo re: Greens (Exhibit 12); 4/26/04 S. Cohen memo to employees re: FRC Policy (Exhibit 13); 4/26/04 S. Cohen memo to Depts. Re: FRC (Exhibit 14); Bessemer Safety Manual General PPE Requirement (Exhibit 15); Bessemer Safety Manual Flame

motion for summary judgment on July 14, 2009 and on the same date filed an opposing brief (Doc.

#84). Finally, on July 24, 2009, U.S. Pipe filed a reply (Doc. #90) to Plaintiffs' opposition response.

## II.   Legal Standards for Evaluating a Summary Judgment Motion

---

Protective Policy (Exhibit 16); U.S. Pipe PPE Requirement (Exhibit 19); USP – N. Birmingham Molten Iron Handling Policy (Exhibit 20); Standard Operating Instruction – Trough Worker (Exhibit 24); Cintas Flame Resistant Garment Service Agreement (Exhibit 27); Articles re: OSHA Violations at USP – Bessemer and N. Birmingham plants (Exhibit 28); USP N. Birmingham Safety Team Minutes (Exhibit 34); USP N. Birmingham Policy re Working in Hot Environments (Exhibit 36); USP N. Birmingham Plant Safety Rules (Exhibit 39); USP Policy re Safe Handling of Molten Iron (Exhibit 41); OSHA Personal Protective Equipment Informational Booklet (Exhibit 42); 5/21/03 Incident Report re: Bessemer Burn Accident (Exhibit 43); PPE slides (Exhibit 45); NBM Safety Committee Slides (Exhibit 49); Thinking Safety Slides (Exhibit 51); Flame Retardant Clothing Required sign (Exhibit 52); Burlington PPE policy (Exhibit 53); CINTAS Information re: Cleaning and Repair of Flame Resistant Clothing (Exhibit 59); White Paper re: INDURA v. Non-FR 100% Cotton (Exhibit 61); Fabric Comparison Table (Exhibit 65); Summary of Plaintiffs' Interrogatory Responses Regarding Prep Work Activities and Time (Exhibit 66); table of Plaintiffs' Interrogatory Responses Regarding Compensable Time (Exhibit 67); C. Albright's Interrogatory Responses (Exhibit 186); C. Bibb's Interrogatory Responses (Exhibit 187); T. Blackmon's Interrogatory Responses (Exhibit 188); E. Canon's Interrogatory Responses (Exhibit 189); L. Carol's Interrogatory Responses (Exhibit 190); J. Champion's Interrogatory Responses (Exhibit 191); J. Cooper's Interrogatory Responses (Exhibit 192); E. Cunningham's Interrogatory Responses (Exhibit 193); D. French's Interrogatory Responses (Exhibit 194); R. Haye's Interrogatory Responses (Exhibit 195); J. Fuller's Interrogatory Responses (Exhibit 196); V. Henton's Interrogatory Responses (Exhibit 197); G. Jones's Interrogatory Responses (Exhibit 198); K. Howard's Interrogatory Responses (Exhibit 199); E. Nelson's Interrogatory Responses (Exhibit 200); A. Phillips's Interrogatory Responses (Exhibit 201); A. Ware's Interrogatory Responses (Exhibit 202); D. Nyguen's Interrogatory Responses (Exhibit 203); J. Williams's Interrogatory Responses (Exhibit 204); M. Spradlin's Interrogatory Responses (Exhibit 205); P. Sargent's Interrogatory Responses (Exhibit 206); R. Varden's Interrogatory Responses (Exhibit 207); V. Tabb's Interrogatory Responses (Exhibit 208); C. Albright Declaration (Exhibit 209); C. Bibb Declaration (Exhibit 210); T. Blackmon Declaration (Exhibit 211); L. Carroll Declaration (Exhibit 212); J. Cooper Declaration (Exhibit 213); J. Fuller Declaration (Exhibit 214); K. Guyton Declaration (Exhibit 215); R. Hayes Declaration (Exhibit 216); V. Henton Declaration (Exhibit 217); J. Holloway Declaration (Exhibit 218); G. Jones Declaration (Exhibit 219); D. Nguyen Declaration (Exhibit 220); W. Owens Declaration (Exhibit 221); A. Phillips Declaration (Exhibit 222); P. Sargent Declaration (Exhibit 223); V. Tabb Declaration (Exhibit 224); R. Varden Declaration (Exhibit 225); J. Champion Declaration (Exhibit 226); K. Howard Declaration (Exhibit 227); A. Ratchford Declaration (Exhibit 228); and S. Norris Declaration (Exhibit 229).

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The party asking for summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings or filings which it believes demonstrate the absence of a genuine issue of material fact. *See id.* at 323. Once the moving party has met her burden, Rule 56(e) requires the non-moving party to go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial. *See id.* at 324.

The substantive law will identify which facts are material and which are irrelevant. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant. *See Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *See id.* at 249.

The method used by the party moving for summary judgment to discharge her initial burden depends on whether that party bears the burden of proof on the issue at trial. *See Fitzpatrick*, 2 F.3d at 1115-17 (citing *United States v. Four Parcels of Real Property*, 941 F.2d 1428 (11th Cir. 1991)(en banc)). If the moving party bears the burden of proof at trial, then it can only meet its initial burden on summary judgment by coming forward with positive evidence demonstrating the absence of a genuine issue of material fact; *i.e.* facts that would entitle it to a directed verdict if not controverted

at trial.  *See Fitzpatrick*, 2 F.3d at 1115.  Once the moving party makes such a showing, the burden shifts to the non-moving party to produce significant, probative evidence demonstrating a genuine issue for trial.

If the moving party does not bear the burden of proof at trial, she can satisfy her initial burden on summary judgment in either of two ways.  First, the moving party may produce affirmative evidence negating a material fact, thus demonstrating that the non-moving party will be unable to prove its case at trial.  Once the moving party satisfies its burden using this method, the non-moving party must respond with positive evidence sufficient to resist a motion for directed verdict at trial.  The second method by which the moving party who does not bear the burden of proof at trial can satisfy its initial burden on summary judgment is to *affirmatively* show the absence of evidence in the record to support a judgment for the non-moving party on the issue in question.  This method requires more than a simple statement that the non-moving party cannot meet its burden at trial but does not require evidence negating the non-movant's claim; it simply requires that the movant point out to the district court that there is an absence of evidence to support the non-moving party's case.  *See Fitzpatrick*, 2 F.3d at 1115-16.  If the movant meets her initial burden by using this second method, the non-moving party may either point out to the court record evidence, overlooked or ignored by the movant, sufficient to withstand a directed verdict, or the non-moving party may come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency.  However, when responding, the non-movant can no longer rest on mere allegations, but must set forth evidence of specific facts.  *See Lewis v. Casey*, 518 U.S. 343, 358 (1996) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992)).

### III.   Relevant Undisputed Facts[4]

#### A.   Introduction

U.S. Pipe is a wholly owned subsidiary of Mueller Water Products, Inc. and is in the business of manufacturing ductile iron pipe and fittings. (*See* Love Dep. at 15; *see also* Burnham Dep. at 14). The named and opt-in Plaintiffs work (or have worked) at four U.S. Pipe plants: North Birmingham and Bessemer, Alabama, Chattanooga, Tennessee, and Burlington, New Jersey. (*See* Amended Compl. ¶¶ 1, 2). The Chattanooga valve and fittings plant was closed in August 2006, and manufacturing ceased at the Burlington plant on February 1, 2008. (*See* Love Dep. at 10, 14; *see also* Polyak Decl. at ¶ 1). The North Birmingham and Bessemer plants remain in operation.

#### B.   U.S. Pipe Requires Employees to Wear Personal Protective Equipment

Starting in early 2004 (and strictly enforced then or sometime later),[5] U.S. Pipe began requiring employees of the Casting and Melting departments to wear fire-retardant "greens." (*See* Amended Compl. ¶¶ 24, 26, 28, 31; *see also* America Dep. at 157, 172, 174-75; Love Dep. at 20;

---

[4] If the facts are in dispute, they are stated in the manner most favorable to Plaintiffs. *Fitzpatrick*, 2 F.3d at 1115.

[5] Although North Birmingham, Bessemer, Chattanooga, and Burlington employees began wearing the greens on or before April 9, 2004, April 28, 2004, May 2004, and August 2004, respectively, (*see* Yarbrough Dep. at 67; Warren Dep. at 83; *see also* Cohen Decl. at ¶ 7; Love Dep. at 18, 48; Burnham Dep. at 231; Polyak Decl. at ¶ 7; Polyak Dep. at 12, 15), additional exhibits demonstrate that it took some time for the policy on wearing the greens to be strictly enforced. (*See, e.g.,* Doc. #83, Exh. 3 (mandatory requirement dated December 11, 2006 to North Birmingham employees – "On January 8, 2007 the mandatory use of flame retardant (Green) PPE in all designated areas . . . will be strictly enforced"); *see also* Adams Dep. at 26-27, 31-32 (initially not mandatory to wear the greens, not until 2006 when U.S. Pipe received a mandatory letter from OSHA); Andrews Dep. at 23-24, 28 (Bessemer plaintiff stating that initially employees doffed the greens when they got hot); Farmer Dep. at 89-90, 91, 114-15 (employees initially doffed greens when they were hot); King Dep. at 22, 26-28, 32, 51, 78, 81, 105-06 (North Birmingham employees initially doffed greens when hot); Penick Dep. at 159-61, 168-69 (North Birmingham employees initially doffed greens when hot); Speight Dep. at 76-77, 83-85 (employees initially doffed greens when hot); Watford Dep. at 33-34, 43-45 (employees doffed greens when hot)).

Burnham Dep. at 127-29; Polyak Dep. at 59-60).  The greens are similar to a pair of blue jeans and a jean jacket, but they are green in color and of a heavier grade and coarser material, INDURA.[6]  (*See* Adams Dep. at 20; *see also* Farmer Dep. at 110-11; Penick Dep. at 116-17; Crawl Dep. at 41-42; Cunningham Dep. at 25, 96; McIntosh Dep. at 22; Murray Dep. at 98, 114).  U.S. Pipe pays for and provides the greens to its hourly employees.  (*See* America Dep. at 144, 157, 172, 174-75; *see also* Love Dep. at 20; Burnham Dep. at 123-24, 127-29; Polyak Dep. at 59-60; Cohen Decl. at ¶ 7; Borg Dep. at 38-39; Yarbrough Dep. at 20-21; Chen Dep. at 20-21).

Although the Rule 56 record is not totally clear regarding the impetus for the requirement of greens-wearing, there is no dispute that employees of the Melting and Casting departments are exposed to molten metal and such exposure is a recognized hazard in the industry.  The greens provide a level of protection against those hazards.  (*See* Borg Dep. at 54-55, 58-60; *see also* Yarbrough Dep. at 47; Boswell Dep. at 27-28; Grassiree Dep. at 21).  In fact, in 2003 several employees at the Bessemer facility (who were not wearing fire-retardant greens) suffered severe burns from molten metal splashes.  (*See* Doc. #83, Exh. 43) ("We are currently investigating procedures/measures to minimize a future similar risk.  Measures may include hoods, face shields, and fire retardant clothing for any employee working on or around the trough."); *see also* Cohen Dep. at 26-28 (greens would have provided a measure of protection to the employees who suffered injuries at the Bessemer plant and the incident "played a part" in implementing the requirement that employees wear greens).

---

[6] The manufacturer of INDURA, Westex Inc., states that it created INDURA to "improve on the 'out-of-the-box' ammonia cure treating process for FR [flame resistant] cotton fabrics" because industrial laundries use "higher temperatures and aggressive chemistries to thoroughly remove soiling" from gear.  (*See* Doc. #83, Exh. 61).

In response to the accident, OSHA performed an investigation.  U.S. Pipe was fined for, among other things, "inadequate personal protective equipment."  (*See* Doc. #84, Exh. 28).  Today, employees working in the Melting and Casting departments are not permitted to enter those work areas if they are not wearing fire-retardant greens.  (*See* Crawl Dep. at 114; Anthony Dep. at 19; Cunningham Dep. at 50; *see also* Penick Decl. at ¶ 6).

U.S. Pipe provides locker rooms and/or bath houses to employees for donning and doffing the greens.[7]  (*See* America Dep. at 148, 172; Polyak Dep. at 43; Love Dep. at 92; Burnham Dep. at 159-60, 162, 165; *see also* Cohen Decl. at ¶ 10; America Decl. at ¶ 4).  When the greens were issued in the Bessemer, North Birmingham, and Chattanooga plants, U.S. Pipe agreed to clean them; in approximately May 2007 U.S. Pipe arranged for CINTAS to clean the greens at the Burlington plant.  (*See* Love Dep. at 50-52; *see also* Yarbrough Dep. at 56, 62-63; Borg Dep. at 52; Yarbrough Dep. at 56, 58-59, 63; Polyak Dep. at 57, 62).  U.S. Pipe instructs employees to place the greens in a bin for laundering after wearing.  (*See* Doc. #83, Exh. 13 ("Employees simply wear the FRC garments

---

[7] Although U.S. Pipe argues, with supporting evidence, that employees are not required to don or doff their greens at work, Plaintiffs argue, with supporting evidence, that U.S. Pipe representatives instructed Plaintiffs to don and doff the greens only at the provided work facilities, and that all Plaintiffs did and do so.  (*See* Adams Dep. at 34-35 (stating he has never taken any PPE home, nor even seen anyone else take PPE home); *see also* Andrews Dep. at 36-37 (stating "you're supposed to leave [the greens at work]; "that's what we were told to do with them;" "all I know is what they told me, to leave them there [at work]; and that's what I did with mine."); Anthony Dep. at 47-48 (stating that he was never told that he could not bring his greens home and that "a couple of guys" took their greens and cleaned them themselves)); T. Davis Dep. at 61-62, 143-44 (stating that she cannot take her greens home, "they told us not to, I think;" and stating that she takes the uniform off at the end of every day and places it in the bin for cleaning because that is her understanding of what U.S. Pipe wants her to do with it); W. Davis Dep. at 41 (stating that she was not allowed to take her PPE home, but that she has never seen a written policy prohibiting her from taking her PPE home; "We were told they were supposed to stay there, but I have never seen anything in writing."); Love Dep. at 51 (when asked whether employees were told they could take their greens home, responding "I don't think that discussion ever came up that I recall.  I mean, I can recall employees coming in in the morning, they'd have their greens on, and some in the afternoons, they'd take them out.  It just never was an issue.")).

approximately one time, after which they place the garment in the dirty clothes bin."); *see also* Doc. #83, Exh.3 ("All issued PPE must be deposited in the soiled bins provided to allow pickup by the designated cleaning service.")).  Some employees have been seen wearing the greens to and from work.  (*See* Borg Dep. at 50-54; *see also* Erwin Dep. at 182-84).

### C.    U.S. Pipe's Customs and the Collective Bargaining Agreement

Each of the plants which are the subjects of this lawsuit operate under the terms and conditions of a Collective Bargaining Agreement ("CBA") reached between the company and the union representing the hourly workers at each plant.  (*See* Love Decl. at ¶ 2; *see also* Polyak Decl. at ¶ 2; Hardin Decl. at ¶ 2; Cohen Decl. at ¶ 2).  Specifically contract negotiations occurred: (1) at the North Birmingham plant in January 2005, resulting in a new contract effective January 30, 2005 (*see* Hardin Dec. at ¶ 3); (2) at the Bessemer plant in October 2004, resulting in a new contract effective November 1, 2004 (*see* Cohen Decl. at ¶ 3); (3) at the Burlington plant in February 2005, resulting in a new contract effective March 20, 2005 (*see* Polyak Decl. at ¶ 3); and (4) at the Chattanooga plant in November 2005 to deal with pay and benefits for employees due to the plant closure and again in March 2006 to extend the May 2002 contract to September 2006 to cover any remaining employees until final closure of the plant.  (*See* Love Dep. at 103-04; *see also* Love Decl. at ¶ 3).  In each CBA it is recorded that the CBA is the complete agreement between the signatories, and that the union is the exclusive bargaining agent for rate of pay, wages, hours of employment, and other conditions of employment.  (*See* Hardin Decl. at ¶ 4 and Exh. A; Polyak Decl. at ¶ 4 and Exh. A; Love Decl. at ¶ 4 and Exh. A; Cohen Decl. at ¶ 4 and Exh. A).  None of the collective bargaining agreements in effect at any of the plants expressly or impliedly address the issue of compensation for the donning and doffing of the greens and other PPE.  (*See* Hardin Dep. at 20-21; Boswell Dep. at 38; Polyak Dep. at 81-83; Love Dep. at 103, 118).

At no time during contract negotiations did the unions attempt to negotiate payment for time spent donning and doffing PPE – in fact, no provision regarding compensation for donning and doffing has ever been included in any of the collective bargaining agreements.[8]  (*See* Hardin Decl. at ¶ 2; *see also* Polyak Decl. at ¶ 2; Love Decl. at ¶ 2; Cohen Decl. at ¶ 2; America Decl. at ¶¶ 2-3). Instead, hourly employees are paid based on shift time or line time, when they begin and end their work, which by definition excludes any pre- and post- shift donning/doffing and walking time.  (*See* Burnham Dep. at 122, 184-85; *see also* Love Dep. at 79, 93, Polyak Dep. at 31-32, 34-35).  Plaintiffs all admit that U.S. Pipe has never compensated them for time spent donning or doffing PPE.[9]  (*See*

_____

[8] Leroy Lassiter, union president at the Bessemer facility, testified that the union raised the issue of non-payment for donning and doffing time during collective bargaining agreement negotiations in 2007, but that was after this lawsuit was filed.  (*See* Lassiter Dep. at 82-83).
     The unions have never filed any grievance over the subject of compensation for donning and doffing activities.  (*See* Penick Dep. at 98-100; *see also* Warren Dep. at 93-95; Lassiter Dep. at 68).

[9] Joseph Penick, a plaintiff who served on the union grievance committee and participated in 2002 and 2005 CBA contract negotiations at the North Birmingham plant, admitted that the company has had a long standing practice of non-compensation for donning and doffing PPE.  (*See* Penick Dep. at 26-28, 98-100) (admission made after Plaintiffs' counsel objected to Defendant's deposition question regarding whether U.S. Pipe has a longstanding custom or practice of nonpayment for donning and doffing on grounds that the question calls for a legal conclusion and no definition was made of the phrase "custom or practice.").  He also admitted that the union has never attempted to negotiate payment for that time (after objection of plaintiffs' counsel to the question).  (*See* Penick Dep. at 102-04).

| | |
|---|---|
| Q: | And at no time during those contract negotiations [2002 and 2005] was the subject ever mentioned regarding payment for putting on or taking off personal protective equipment, right? |
| A: | Correct. |
| Q: | It was never mentioned or raised by the union at any time, correct? |
| A: | Correct. |
| Q: | And that was despite the fact you and the other negotiating members knew that U.S. Pipe had a policy and custom and a practice of not paying for the time it took to put on and take off that PPE; correct? |
| A: | Correct. |

(Penick Dep. at 98-99).  Jimmy Warren (North Birmingham union representative) and Leroy Lassiter

Adams Dep. at 34; Andrews Dep. at 13-15, 18, 32-33, 51-52; Anthony Dep. at 14-16; Barnes Dep.

at 16-20, 31; Burrell Dep. at 16-17; Colter Dep. at 33; Craig Dep. at 31-32; Crawl Dep. at 22-23;

Cunningham Dep. at 21-22; T. Davis Dep. at 15, 17-18, 20; W. Davis Dep. at 21-23, 34; Duga Dep.

at 14-19, 47; Farmer Dep. at 21-22, 56-57; Hill Dep. at 31, 43, 81-82; Huffstutler Dep. at 72; King

Dep. at 35, 94; Lassiter Dep. at 85-87; Long Dep. at 12-13, 33; Maye Dep. at 24, 31-32; McIntosh

Dep. at 17-19; McWaine Dep. at 12-15, 25; Murray Dep. at 44-47; Penick Dep. at 26-27; Rudolph

Dep. at 13-14, 66; Sims Dep. at 33-35; Speight Dep. at 36-37; Stephens Dep. at 10-11, 15, 81;

Townsend Dep. at 11-15, 78; Walker Dep. at 30-31; Warren Dep. at 40-44; Watford Dep. at 64-66;

Watkins Dep. at 11-15; Valme Dep. at 32-33).

## IV.   **Applicable Substantive Law and Discussion**

U.S. Pipe contends that because it has a longstanding custom or practice of not paying its

employees for time spent donning and doffing PPE, Section 203(o) of the FLSA is a complete

defense for the donning and doffing claims.  (*See* Doc. #76 at 1).  According to U.S. Pipe, even

without such a custom or practice, the company would nevertheless be entitled to summary judgment

because: (1) donning and doffing the PPE are not principal activities but preliminary ones based

upon both: (A) the activities' inherent nature and (B) the fact that Plaintiffs had the clear option and

ability to don and doff offsite; (2) the time spent donning and doffing does not constitute "work"

within the longstanding FLSA definition of that term; and (3) the activities are *de minimis* and not

compensable as a matter of law.  (*See* Doc. #76 at 2-3).  As to the claims associated with time spent

walking after donning the PPE and before arriving at the assigned work location and before doffing

---

(Bessemer union representative) made the same admissions regarding the "long-standing practice" of non-compensation on the same objections from plaintiffs' counsel.  (*See* Warren Dep. at 43, 44; *see also* Lassiter Dep. at 85).

the PPE, U.S. Pipe contends that such time is not compensable because no principal activity is performed prior to walking as defined by the Portal-to-Portal Act. (*See* Doc. #76 at 2-3).

The parties respective positions are discussed below.

### A.    Pertinent Legal Framework of the Fair Labor Standards Act

The Fair Labor Standards Act ("FLSA") governs an employer's standard wage and hour practices, and makes it unlawful for an employer to employ someone for a workweek longer than forty hours unless the employee receives compensation at a rate of at least one and one-half times the regular hourly wage for time worked in excess of forty hours. *See* 29 U.S.C. §§ 207(a)(1), 215(a)(2). The FLSA defines "employ" as "to suffer or permit to work," but it does not define "work." *See* 29 U.S.C. § 203(g).

After the promulgation of the FLSA, the Supreme Court interpreted "work" or "employment" as "physical or mental exertion (whether burdensome or not) controlled or required by the employer and pursued necessarily and primarily for the benefit of the employer and his business." *IBP, Inc. v. Alvarez*, 546 U.S. 21, 25, 126 S.Ct. 514 (2005) (*quoting Tennessee Coal, Iron & R. Co. v. Muscoda Local No. 123*, 321 U.S. 590, 598 (1944)). The definition of the "statutory workweek" was held to include "all time during which an employee is necessarily required to be on the employer's premises, on duty or at the prescribed workplace." *Id.* (*citing Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 690-91 (1946)).

### B.    The Effect of 29 U.S.C. § 203(o) on Plaintiffs' Donning and Doffing PPE Claims

With those definitions announced by the Supreme Court came the admonition by Congress that judicial interpretations of the FLSA had superceded "long-established customs, practices, and contracts between employers and employees, thereby creating wholly unexpected liabilities, immense in amount and retroactive in operation." *Alvarez*, 546 U.S. at 25 (*citing* the Portal-to-

13

Portal Act, 61 Stat. 84).  To remedy that situation, the Portal-to-Portal Act was passed, amending

certain provisions of the FLSA.  To be sure, Congress intended to shield employers from unexpected

liability.  In 1949 Section 203(o) was added to the definition section of the FLSA:

> Hours Worked.– In determining for the purposes of section 206 and 207 of
> this title the hours for which an employee is employed, there shall be
> excluded any time spent in changing clothes or washing at the beginning or
> end of each workday which was excluded from measured working time
> during the week involved by the express terms of or by custom or practice
> under a bona fide collective bargaining agreement applicable to the particular
> employee.

The bill's sponsor explained that the purpose of the amendment was to "avoid[] another series of

incidents which led to the portal-to-portal legislation" and that the amendment would close a

"loophole" within the Portal-to-Portal Act.  *See Anderson v. Cagle's*, 488 F.3d 945, 958 (11th Cir.

2007) (citing 95 Cong. Rec. 11,433 (daily ed. Aug. 10, 1949) (comments of Rep. Herter)).

One of the early cases dealing with Section 203(o) was *Steiner v. Mitchell*, 350 U.S. 247, 248

(1956).  In that case, the Supreme Court addressed the question "whether workers in a battery plant

had a statutory right to compensation for the 'time incident to changing clothes at the beginning of

the shift and showering at the end, where they must make extensive use of dangerously caustic and

toxic materials, and are compelled by circumstances, including vital considerations of health and

hygiene, to change clothes and to shower in facilities which state law requires their employers to

provide . . .'".  *Alvarez*, 546 U.S. at 29 (quoting *Steiner*, 350 U.S. at 248).  In concluding that the

donning and doffing at issue in *Steiner* was compensable under the FLSA, the Court agreed that

"activities, such as the donning and doffing of specialized protective gear that are 'performed either

before or after the regular work shift, on or off the production line, are compensable under the

[FLSA] if those activities are an integral and indispensable part of the principal activities for which

covered workmen are employed and are not specifically excluded by Section 4(a)(1)'" of the Portal-to-Portal Act. *Id.* (quoting *Steiner*, 350 U.S. at 256).

It is under this framework that U.S. Pipe's "clothes" argument is considered. If the greens[10] are properly categorized as clothes, then time spent donning and doffing them may be either compensable or non-compensable by "agreement." *See* 29 U.S.C. § 203(o). Plaintiffs contend of course that the greens are not clothes but specialized protective gear, for which time spent donning and doffing is compensable even absent a custom or practice indicating otherwise. (*See* Doc. #84 at 21) ("The nature and purpose of the greens at issue here places the fire-suits in the category of specialized protective equipment, particularly because they are flame-retardant gear designed and used for protection against molten metal exposure.").

### 1.    The applicable definition of "clothes"[11]

The parties' dispute as to whether the greens constitute "clothes" for purposes of the statute is a question of law for this court. *See e.g., Figas v. Horsehead Corp.*, 2008 WL 4170043, No. 06-1344 at *12 (W.D. Pa. Sept. 3, 2008). The only controlling authority on this question is *Anderson v. Cagle's*, decided by the Eleventh Circuit in June 2007.[12]  488 F.3d 945 (2007). The *Cagle's* court

---

[10] There is (and has been) no dispute that the other PPE worn by plaintiffs – boots, hard hats, safety glasses, ear plugs, and spats – are clothes for purposes of Section 203(o). (*See* Doc. #84 at 20) ("First, §3(o) is inapplicable to these proceedings because the fire suits worn by the plaintiffs are not 'clothes.'"); (*see also* Doc. #90 at 3, n. 4). Therefore, the court's analysis here will focus only on the greens.

[11] The parties make no argument regarding the "changing" clothes aspect of the statute, so the court need not consider it here.

[12] The Eleventh Circuit's ruling on the definition of "clothes" as set out in 29 U.S.C. § 203(o) rejects the conclusion reached in *Alvarez v. IBP, Inc.*, 339 F.3d 894 (9th Cir. 2003). In *Alvarez*, the Court of Appeals for the Ninth Circuit held that specialized protective gear required to be worn by meat production employees – including, *inter alia*, plastic aprons, Kevlar gloves, and mesh leggings, vests and sleeves – did not fall within the meaning of "clothes" under Section 203(o). In so holding,

consulted Webster's Dictionary for a definition of clothes as "covering for the human body or garments in general: all the garments and accessories worn by a person at any one time," and found that the dictionary definition was consistent with the common understanding of the word. 488 F.3d at 955. In so defining "clothes," the *Cagle's* court squarely rejected the employees' argument that Section 203(o) did not apply to *any* protective clothing whatsoever and broadly stated that "§203(o) is not an exemption under the FLSA but is instead a definition that limits the scope of the FLSA's key minimum wage and maximum hour provisions." 488 F.3d at 956-57. This broad definition of "clothes" now governs §203(o) in the Eleventh Circuit, with the recognition by the *Cagle's* court that "there may be limits to the application of §203(o) based on the nature or purpose of the garments at issue." 488 F.3d at 955. In its analysis, the *Cagle's* court did not find the limitation to apply because the plaintiffs therein wore only "general protective clothing" such as "smocks, hair/beard nets, gloves, and hearing protection." 488 F.3d at 949, 955-56.

Other district courts have further considered the issue of "clothes" as that term is used by §203(o) and have come to divided decisions. In *Figas v. Horsehead Corp.*, a district judge in the Western District of Pennsylvania found that protective materials worn by U.S. Steel employees working at a zinc processing facility – including  flame retardant jackets, pants, and coveralls, hard hats, and work shoes – were "clothes" within the meaning of §203(o).[13] 2008 WL 4170043, at *7-

---

the court viewed Section 203(o) as an FLSA exemption that must be narrowly construed against the employer.  *See id.* at 905.  Applying this narrow construction, the court reasoned that specialized protective gear worn to protect against a hazard is different in kind from typical clothing and does not "plainly and unmistakably" fit within Section 203(o)'s clothing term.  *Id.*

[13] The *Figas* plaintiffs argued that the fire retardant gear is "heat and flame retardant and [is] specially manufactured . . ." (*id.* at *11) thus constituting specialized protective clothing.  2008 WL 4170043, at *7-11.  The district court rejected that argument, noting that "'protective' does not deprive 'clothes' of their fundamental character."  *Id.*

12.[14]   In so ruling, the *Figas* court disagreed with the district court for the Middle District of

Pennsylvania in *In re Cargill Meat Solutions Wage & Hour Litig.*, No. 3:cv-06-513, 2008 WL

6206795 (M.D. Pa. Apr. 10, 2008), which held that the personal protective equipment worn by meat

processing employees – including smocks, hard hats, hairnets, earplugs, steel-toed boots, safety

glasses, plastic gloves, rubber gloves, plastic sleeves, and cut-resistant gloves – was not clothing

under Section 203(o).  Unlike the *Figas* court, the *Cargill* court adopted the Ninth Circuit's narrow

construction of Section 203(o) in *Alvarez* and found that the items at issue were not "clearly and

unmistakably recognized as clothing." 2008 WL 620675, at *14.  Rather, "[s]uch items may be more

appropriately defined as safety equipment or gear worn by an employee for protection."  *Id.*; *see also*

*Spoerle v. Kraft Foods Global, Inc.*, 527 F. Supp.2d 860 (W.D. Wis. 2007); *Gonzalez v. Farmington*

*Foods, Inc.*, 296 F. Supp.2d 912 (N.D. Ill. 2003); *Perez v. Mountaire Farms, Inc.*, 2008 WL

2389798, No. AMD 06-121 (D. Md. June 10, 2008) (all narrowly construing the meaning of

"clothes" under §203(o) and holding that certain personal protective gear did not fall within that

meaning).

The most recent case on the subject of the definition of "clothes" comes from the Western

District of Pennsylvania, *Andrako v. U.S. Steel Corp.*, 2009 WL 1765847, No. 07-1629 (W.D. Pa.

June 22, 2009).  The district court found that the articles plaintiffs donned and doffed – flame

retardant jackets and pants ("greens" or "oranges"), glasses, boots, snoods, and hard hats – were

plainly "clothes" within the meaning of Section 203(o) and the common definition of "clothes."

---

[14] In the same month, the Western Division for the Western District of Tennessee ruled that employees at a hog slaughtering and processing plant were not entitled to compensation for donning and doffing protective gear – hair and beard nets, ear plugs, hard hats, rubber and/or cotton gloves, frocks/white coats, and rubber steel-toed boots – in part because the gear was properly classified as "clothes" under Section 203(o).  *See Sisk v. Sara Lee Corp.*, 590 F. Supp.2d 1001, 1003, 1009 (W.D. Tenn. 2008) (deferring to the interpretation by the DOL that the PPE are "clothes.").

2009 WL 1765847, at *8-9.  In so finding, the *Andrako* court agreed with the *Figas* court that the protective nature of clothes does not deprive them of their fundamental character.  *See* 2009 WL 1765847, at *9.

Finally, the Department of Labor ("DOL"), the agency responsible for administering the FLSA, has issued two opinion letters in the past decade advising that clothes "include items worn on the body for covering, protection, or sanitation," for the purpose of applying and enforcing Section 203(o).  The DOL issued the first opinion letter on June 6, 2002, and reiterated its view in a letter issued in May 14, 2007.  *See* Fair Labor Standards Act, U.S. Dept. of Labor, Wage & Hour Div., Advisory Op. Ltr. No. FLSA 2002-2 (June 6, 2002) and Advisory Op. Ltr. No. FLSA 2007-10 (May 14, 2007).

### 2.      Application of the "clothes" definition to Plaintiffs' case

The court finds most persuasive the *Figas* and *Andrako* line of cases which, when read in conjunction with the Eleventh Circuit's pronouncement in *Cagle's*, dictate a finding that the articles Plaintiffs don and doff prior to and following their shifts are plainly "clothes" within the meaning of the statute.  In coming to that conclusion, the court has carefully considered Plaintiffs' argument that the greens are specialized clothing and therefore not clothes within the meaning of the statute. (*See* Doc. #84 at 20-23).  But that argument can be boiled down to one (well supported) point – that the greens protect employees working in the melting and casting departments from the real danger of molten metal exposure.[15]  (*See id.*)  As well stated by the district court for the Western District of

---

[15] Thousands of tests have been conducted to measure the performance of the fabric vis-a-vis molten metal splash exposures and other fire hazards.  (*See* Doc. #84 at 22).  The greens are "produced with high-strength ring-spun yarns which are woven to strict custom-engineered specifications" and are manufactured with double-shrink technology which "represents a major improvement in the progressive shrinkage that cotton garments experience throughout their life and it is far superior to any other process utilized today."  (*Id.*)

Pennsylvania, "the adjective 'protective' does not deprive 'clothes' of their fundamental character," nor does the protective nature of garments necessarily make them "specialized." *Figas*, 2008 WL 4170043, at *11; *see also Andrako*, 2009 WL 1765847, at *9.  This court is not convinced that the Eleventh Circuit had in mind coarse, heavy cotton pants and jackets that have been treated to be flame-retardant around molten metals as specialized clothing.[16]  *See Cagle's*, 488 F.3d at 956 (noting that plastic shields, steel mesh gloves, and spacesuits may constitute specialized clothing); *see also Andrako*, 2009 WL 1765847, at *9, n. 10 ("The items at issue in this case also are a far cry from some of the specialized protective equipment such as mesh aprons and plastic arm guards . . .").  By description, look, feel, purpose, fit, and basic common sense, the greens at issue here are "clothes" within the meaning of Section 203(o).[17]

### 3. Because the greens are "clothes," the issue of compensation is left to the collective bargaining process.

The determination that the greens are "clothes" as defined by Section 203(o) of the FLSA leaves the issue of compensation subject to the collective bargaining process, which is what Congress intended when it enacted Section 203(o).  *See Figas*, 2008 WL 4170043, at *12.  The Eleventh Circuit instructs that a policy concerning noncompensation (or compensation as the case may be) for clothes changing, written *or unwritten*, in force or effect at the time a CBA was executed satisfies § 203(o)'s requirement of a "custom or practice under a bona fide" CBA.  *See Cagle's*, 488

---

[16] In fact, the court concludes the opposite is true – the Eleventh Circuit would find the PPE at issue here to be "clothes" under § 203(o).

[17] This ruling is consistent with the DOL opinion letters, which are entitled to deference in this instance.  *See Skidmore v. Swift &Co.*, 323 U.S. 134, 140 (1944) ("The weight of such a judgment in a particular case will depend on the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control.").

F.3d at 958-59 (citing *Turner v. City of Philadelphia*, 262 F.3d 222, 225-27 (3d Cir. 2001) (emphasis added)).  Absence of negotiations demonstrates acquiescence to the policy.  *See id.* at 959.  In this way, if U.S. Pipe can initially show "the absence of a genuine issue of material fact" that U.S. Pipe had the "custom or practice" of noncompensation for donning and doffing time, then the company is entitled to summary judgment unless Plaintiffs can come forward with probative evidence demonstrating the existence of a triable issue of fact.  *See Figas*, 2008 WL 4170043, at *12.  Because there is no provision on compensation for donning and doffing of PPE in the CBAs at issue, the question is whether that time is excluded from compensation by practice or custom.  *See Anderson v. Cagle's*, 2005 WL 3873160, No. 1:00-cv-166 (WLS), at *8 (M.D. Ga. Dec. 8, 2005) (citing *Anderson v. Pilgrim's Pride Corp.*, 147 F. Supp.2d 556, 565 (E.D. Tex. 2001)); *see also Davis v. Charoen Pokphand (USA), Inc.*, 302 F. Supp.2d 1314, 1320 (M.D. Ala. 2004).

There are few cases providing guidance as to what constitutes a "custom or practice" under §3(o).  The *Cagle's* court briefly addressed the issue, "relying again on a common sense understanding of the statute's language" and determining that the "custom or practice" language was satisfied where CBAs executed in 1997, 2000, and 2003 did not provide for compensation of donning and doffing time.  488 F.3d at 958-59.  Other cases that exist on the issue are not binding on this court.  *See Turner v. City of Philadelphia*, 262 F.3d 222, 226-27 (3d. Cir. 2001)[18] (Department of Corrections 30 year policy of non-compensability for change time was a custom or practice acquiesced to by union members); *see also Arcadi*, 38 F.3d at 674-75 (citing *Saunders v. John Morrell & Co.*, 1991 WL 529542, No. C88-4143, at *4 (N.D. Iowa Dec. 24, 1991) (workers not paid for clothes-changing during previous five years showed custom or practice existed to

---

[18] The Eleventh Circuit cited this case with approval in *Cagle's*.  488 F.3d at 959.

exclude time)); *Davis*, 302 F. Supp.2d at 1320-21 (plaintiff's knowledge that she was not going to be compensated under the CBA for clothes changing time invoked 203(o)); *Burks v. Equity Group-Eufaula Div., LLC*, 571 F.Supp. 1235, 1245 (M.D. Ala. 2008) ("In this case, there is no dispute that Equity had a policy in force or effect at the time the CBAs relevant to this case were executed that Plaintiffs would not be compensated for pre- and post-shift donning and doffing of protective clothing . . . Consequently, this Court finds that the pre- and post-shift donning and doffing of protective clothing is properly excluded under § 203(o) pursuant to a custom or practice under a bona fide collective bargaining agreement, and Equity is entitled to summary judgment on this issue.").

### a.    Facts governing the question of "custom or practice."

It is undisputed that Plaintiffs work in positions covered by a series of CBAs entered into by U.S. Pipe and the unions representing the hourly employees.  (*See* Love Decl. at ¶ 2; *see also* Polyak Decl. at ¶ 2; Hardin Decl. at ¶ 2; Cohen Decl. at ¶ 2).  Those CBAs have the following effective dates: North Birmingham January 30, 2005; Bessemer November 1, 2004; Burlington March 20, 2005; and Chattanooga March/September 2006.  (*See* Hardin Decl. at ¶ 3; Cohen Decl. at ¶ 3; Polyak Decl. at ¶ 3; Love Dep. at 103-04; Love Decl. at ¶ 3).  None of those agreements expressly or impliedly address the issue of donning and doffing greens and each contain language affirming that the agreements represent the entire agreement and understanding between the parties.  (*See* Hardin Decl. at ¶ 4 and Exh. A; Hardin Dep. at 20-21; *see also* Polyak Decl. at ¶ 4 and Exh. A; Polyak Dep. at 81-83; Love Decl. at ¶ 4 and Exh. A; Love Dep. at 103, 118; Cohen Decl. at ¶ 4 and Exh. A; Boswell Dep. at 38).

During negotiations for each of the CBAs, the unions never proposed or attempted to negotiate for any compensation for time spent donning and doffing,[19] despite the fact that all four of the plants at issue created a greens-wearing policy some time in Spring/Summer 2004 and prior to that time all four of the plants required employees to wear *other* PPE also at issue in this lawsuit, including boots,[20] hard hats, safety glasses, ear plugs, and spats.  (*See* Hardin Decl. at ¶2; Polyak Decl. at ¶ 2; Love Decl. at ¶ 2; Cohen Decl. at ¶ 2; America Decl. at ¶¶ 2-3).  Although the union never negotiated for additional compensation, employees at each plant were acutely aware that they were not compensated for donning and doffing time.  (*See* Adams Dep. at 34; *see also* Andrews Dep. at 13-15, 18, 32-33, 51-52; Anthony Dep. at 14-16; Barnes Dep. at 16-20, 31; Burrell Dep. at 16-17; Colter Dep. at 33; Craig Dep. at 31-32; Crawl Dep. at 22-23; Cunningham Dep. at 21-22; T. Davis Dep. at 15, 17-18, 20; W. Davis Dep. at 21-23, 34; Duga Dep. at 14-19, 47; Farmer Dep. at 21-22, 56-57; Hill Dep. at 31, 43, 81-82; Huffstutler Dep. at 72; King Dep. at 35, 94; Lassiter Dep. at 85-87;

_____

[19] Although Leroy Lassiter testified that the union raised the issue at the Bessemer plant in 2007, that was *after* this lawsuit was filed, and therefore is not relevant here.  (*See* Lassiter Dep. at 82-83).  Had the union raised the issue prior to the lawsuit and compensation was nevertheless not provided for in the CBA, that fact may have foreclosed the Bessemer plaintiffs' claims in this case.  *See Davis*, 302 F. Supp.2d at 1320 (citing *Hoover v. Wyandotte Chem. Corp.*, 455 F.2d 387, 389 (5th Cir. 1972) and *Bejil v. Ethicon, Inc.*, 269 F.3d 477, 480 (5th Cir. 2001); *Arcadi v. Nestle Food Corp.*, 38 F.3d 672, 675 (2d. Cir. 1994); *In re Cargill*, 2008 WL 6206795 at *17 (M.D. Pa. Apr. 10, 2008) ("Because of the union's proposal during negotiations and the rejection of the proposal, the payment to "mesh-wearing" employees and the non-payment to "non-mesh-wearing" employees became a "custom or practice" under the . . . CBA.").  In such a situation, "the union failed to achieve through the process of collective bargaining" and that compensation despite such failure "would not be delivered to [the union] under the provisions of the Fair Labor Standards Act."  *Bejil*, 269 F.3d at 480; *see also Gatewood v. Koch Foods of Mississippi*, LLC, 569 F. Supp.2d 687 (S.D. Miss. 2008) (quoting *Livadas v. Bradshaw*, 512 U.S. 107, 131 (1944) ("[U]nion-represented employees have the full protection of the minimum standard, absent any agreement for something different.  When employees "opt out" of this protection when entering into a collective bargaining agreement, they cannot later advance a claim for compensation based on the same activity.").

[20] Several Plaintiffs admit that the boots take the longest amount of time to don and doff. (*See* Farmer Dep. at 82-92; *see also* McIntosh Dep. at 19; Penick Dep. at 132-33).

Long Dep. at 12-13, 33; Maye Dep. at 24, 31-32; McIntosh Dep. at 17-19; McWaine Dep. at 12-15, 25; Murray Dep. at 44-47; Penick Dep. at 26-27; Rudolph Dep. at 13-14, 66; Sims Dep. at 33-35; Speight Dep. at 36-37; Stephens Dep. at 10-11, 15, 81; Townsend Dep. at 11-15, 78; Walker Dep. at 30-31; Warren Dep. at 40-44; Watford Dep. at 64-66; Watkins Dep. at 11-15; Valme Dep. at 32-33).  The only wrinkle is one dispute[21]  – whether the policy of wearing greens was *mandatory*, at least for the Bessemer and North Birmingham plants, prior to the negotiations of the CBAs.  The following chart makes the relevant dates clear:

|  | Bessemer | N. Birmingham | Burlington | Chattanooga |
|---|---|---|---|---|
| Date employees began wearing the greens | April 28, 2004 | April 9, 2004 | August 2004 | May 2004 |
| Effective dates of CBAs | November 1, 2004 | January 30, 2005 | March 20, 2005 | November 2005; March 2006 |
| Strict enforcement of greens-wearing policy | Until 2005, employees allowed to doff greens when they became hot[22] | January 2007[23] | ---------- | ----------- |

The question is whether these facts establish plaintiffs' acquiescence to non-compensability of changing time under the "custom or practice" language of § 3(o).

---

[21] The court agrees with U.S. Pipe that this "dispute" is somewhat disingenuous. (*See* Doc. #90 at 3-4, n. 6, 7).

[22] *See* Grassiree Dep. at 65.

[23] *See* Doc. #83, Exh. 3.

b.      Application of "custom or practice" to Plaintiffs' claims

The Second Circuit has thoroughly addressed the question of what constitutes a "custom or practice" for purposes of Section 203(o), and the court finds that the reasoning employed by that circuit is consistent with the Eleventh Circuit's brief analysis of the same issue.[24]  *See Arcadi*, 38 F.3d at 672.  As a definitional matter, the *Arcadi* court found that "custom" suggests an ongoing understanding with some continuity.  *See Arcadi*, 38 F.3d at 675.  That definition applies here.  No one disputes that U.S. Pipe had a decades-long requirement that Plaintiffs wear boots, hard hats, safety glasses, ear plugs, and spats as personal protection prior to the time they negotiated collective bargaining agreements.  (*See* McIntosh Dep. at 9, 40-42) ("[F]or 35 years, . . . it had always been that way.").  Even the greens were undisputedly mandated, for at least two of the plants, to be worn many months prior to the time of negotiating collective bargaining agreements.  Because the mandatory requirement to wear PPE is not new in any sense of the word, the court finds there was a custom of non-compensation for the donning and doffing of PPE.  *See also Gatewood*, 569 F. Supp.2d at 700, n. 23 (quoting *Kassa v. Kerry, Inc.*, 487 F. Supp.2d 1063, 1068 (D. Minn. 2007) ("[T]he term 'custom or practice' is broad enough to capture a long-standing practice by an employer for non-payment . . . provided that the employer can demonstrate that the practice of non-payment was sufficiently long in duration and that its employees knew of and acquiesced in the practice.").

------

[24] The court does not find that the facts presented herein fall within the ambit of footnote 14 of *Cagle's* as Plaintiffs contend.  (*See* Doc. #84 at 31-34).  That footnote reads:

> We do not intend to suggest that a policy implemented after the parties executed a CBA would satisfy §203(o)'s custom or practice requirement during the effective period of that particular CBA.  That question is not before us.

However, even if this were not the case and there were no "custom" of non-compensation for donning and doffing PPE because the greens themselves are a relatively new requirement, non-compensation would nevertheless squarely fit under the "practice" analysis. Again borrowing from *Arcadi*, the court finds that unlike "custom," a "practice" can include understandings with regard to the future agreed to by the parties. *See Arcadi*, 38 F.3d at 675. Whereas a custom suggests an ongoing course of conduct, there may be a new practice that looks only to the future. *See Arcadi*, 38 F.3d at 675. Taking that analysis one step further, this court finds (agreeing with the Southern District of Mississippi) that when employees and union representatives are conclusively aware of the facts surrounding compensation policies for changing clothes at the beginning and end of each workday, and reach an agreement under a CBA that does not compensate employees for the time, a "practice" exists under the CBA sufficient to invoke the § 203(o) defense.[25] *See Gatewood*, 569 F. Supp.2d 687, 701 (S.D. Miss. 2008). Thus, even in the absence of a long-standing tradition of noncompensation, the practice established under the terms of the fully and fairly negotiated CBAs makes the claims for compensation for donning and doffing PPE untenable under § 203(o). *See id.*

---

[25] As the *Gatewood* court stated:

> If reviewing courts labor to find extrinsic evidence of a "custom or practice," beyond the existence of a fairly negotiated CBA and a team of union negotiators and employees that were fully aware of the relevant compensation practices, then courts will inadvertently encourage employees and union negotiators to either remain ignorant of compensation policies or to avoid any mention of them, lest they be seen to have created a custom or practice that waived a potential claim for compensation under § 203(o). An outcome that encourages artifice between parties negotiating a CBA is wrong from a policy perspective, and risks that reviewing courts will simply reward parties for not faithfully negotiating the CBA in the first instance.

*Gatewood*, 569 F. Supp.2d at 700, n.28.

Such a reading of § 203(o) best reflects Congressional intent in adopting the statute to "curtail employee-protective interpretations of the FLSA" on compensation issues settled by a CBA.[26]

The PPE at issue are clothes, and the compensation for time spent donning and doffing the clothes has been excluded by custom or practice with the relevant collective bargaining agreements. Therefore, U.S. Pipe is entitled to summary judgment on all of Plaintiffs' claims related to time spent for donning and doffing PPE.

### C.     The Continuous Workday Rule Provides that the Activities Performed Post-Donning of the Greens May be Compensable

As set out earlier in this opinion, the Portal-to-Portal Act narrowed the coverage of the FLSA to shield employers from unexpected liability. As relevant here, the Act "narrowed the coverage of the FLSA by excepting two activities that had been treated as compensable under [the caselaw]: walking on the employer's premises to and from the actual place of performance of the principal activity of the employee, and activities that are 'preliminary or postliminary' to that principal

---

[26] Again, as the *Gatewood* court stated:

> The alternative holding would require the Court to presume that Union representatives were unaware of how their employees were compensated, an inference not supported by the current facts. Perhaps more importantly, overreading the contractual silence on donning and doffing ignores the possibility that both sides in the negotiation of a CBA might have real and legitimate reasons for omitting an explicit reference to these issues. Based on the sophistication of each party, the Court finds it inconceivable that the Union was unaware of the compensation policies of Koch Foods to the extent that it could not have fully and fairly bargained them away based on other priorities. Merely because a potential change in the law makes these issues appear more enticing in hindsight does not mean this Court should upset the agreement struck between the parties. Congress enacted § 203(o) to protect employers from precisely this kind of post-mortem attack on labor contracts every time a court interprets a gray area on FLSA compensation issues.

*Gatewood*, 569 F. Supp.2d at 700, n.29.

activity." *IBP, Inc. v. Alvarez*, 546 U.S. 21, 27-28 (2005) (citing 29 U.S.C. § 254(a)).  Regulations adopted shortly after the Portal-to-Portal Act's promulgation adopt the "continuous workday rule," which defined the "workday" as "the period between the commencement and completion on the same workday of an employee's principal activity or activities." *See* 29 C.F.R. § 790.6(b), quoted in *Alvarez*, 546 U.S. at 29.

In *Alvarez*, the Supreme Court addressed, *inter alia*, the applicability of the Portal-to-Portal Act to post-donning and pre-doffing walking time.  In finding that the Portal-to-Portal Act did not preclude compensation for such walking time under the facts of the cases before it, the Court held that when the donning and doffing are integral and indispensable to an employee's principal activities, the donning and doffing themselves become principal activities within the meaning of the FLSA.  *Alvarez*, 546 U.S. at 33, 37 ("[A]ny activity that is 'integral and indispensable' to a 'principal activity' is itself a 'principal activity' under § 4(a) of the Portal-to-Portal Act.").  Because walking after the employee's first principal activity and before the last principal activity occurs within the continuous workday, the Portal-to-Portal Act does not apply to such walking time, let alone exclude it from FLSA coverage.  *Id.* at 34, 37.  Under this analysis, the question before the court is whether the donning of the greens, that activity itself noncompensable under §203(o), may nevertheless commence the continuous workday, thus potentially allowing for compensable walking time.

U.S. Pipe does not spend a lot of time arguing against such compensability in this instance, citing to a May 14, 2007 Opinion Letter from the DOL (which stated that "activities covered by section 3(o) cannot be considered principal activities and do not start the workday") and a 2008 district court decision out of the Western District of Tennessee that relies primarily on the DOL letter to reach the same conclusion.  (Doc. #76 at 37-38; *see also* Doc. #90 at 7, n. 16).  Plaintiffs, on the other hand, point to the Western District of Pennsylvania's *Figas* decision, as well as the Southern

District of Mississippi's *Gatewood* decision for the holdings that "activities rendered noncompensable under §203(o) by a collective bargaining agreement can nevertheless mark the beginning and end of a continuous workday for purposes of the Portal Act." *Figas*, 2008 WL 4170043, at *20.

1. **This court once again agrees with the conclusions of *Andrako, Figas, and Gatewood*.**

After careful consideration of both views, this court agrees with the *Andrako*, *Figas*, and *Gatewood* courts that the Portal-to-Portal Act does not preclude compensation for post-donning and pre-doffing walking time.  As the courts before this one have stated:

> Section 203(o) relates to the *compensability* of time spent donning, doffing, and washing in the collective bargaining process.  It does not render such time any more or less integral or indispensable to an employee's job.

*Andrako*, 2009 WL 1765847, at *11.

> Although the statute precludes recovery for time spent washing and "changing clothes," it does not affect the fact that these activities could be the first "integral and indispensable" act that triggers the start of the continuous workday rule for subsequent activities that are not covered by § 203(o), such as post-donning sanitation and travel time.

*Gatewood*, 569 F. Supp.2d at 702, n. 31.

> [The court is not convinced] that § 203(o) changes the "principal" nature of donning and doffing activities, or that "principal" activities somehow become "preliminary" or "postliminary" under the Portal Act simply because they are rendered noncompensable by a collective-bargaining agreement in accordance with § 203(o).  A determination to the contrary would expand § 203(o)'s exclusion beyond donning, doffing and washing time to include post-donning and pre-doffing travel time, which is not mentioned therein.

*Figas*, 2008 WL 4170043, at *20.

> This reading of Section 203(o) is consistent with the Supreme Court's decision in *Alvarez*.  In *Tum v. Barber Foods, Inc.*, one of the cases before the Supreme Court in *Alvarez*, the jury had found that otherwise "integral and indispensable" donning and doffing time was not compensable under the de

minimis doctrine." *See Alvarez*, 546 U.S. at 38-39 (explaining *Tum*'s procedural history); *see also Tum Barber Foods, Inc.*, 360 F.3d 274, 278-79 (1st Cir.2004), *rev'd on other grounds sub nom. Alvarez*, 546 U.S. 21, 126 S.Ct. 514, 163 L.Ed.2d 288; *DeAsencio*, 500 F.3d at 370 n. 9. Notwithstanding this fact, the Supreme Court firmly held that the employees' post-donning and pre-doffing walking time in Tum was part of the continuous workday and, therefore, the Portal-to-Portal Act did not apply to such time. *Alvarez*, 546 U.S. at 39. Defendant has not advanced any argument as to why de minimis activity can be principal but non-compensable while Section 203(o) activity cannot.

*Andrako*, 2009 WL 1765847, at \*12.

But that holding does not resolve the dispute. That is because the donning of the PPE must be a principal activity before it can begin the continuous workday.

### 2.    Principal Activity Analysis

The Eleventh Circuit uses the factors outlined in *Dunlap v. City Elec. Inc.*, 527 F.2d 394, 398-400 (5th Cir. 1976) and *Bonilla v. Baker Concrete Constr.*, 487 F.3d 1340 (11th Cir. 2007) to determine whether activities are integral and indispensable to principal work activities. Those factors are: (1) whether the activity is required by the employer; (2) whether the activity is necessary for the employee to perform his or her duties; and (3) whether the activity primarily benefits the employer. *See Bonilla*, 487 F.3d at 1344 (citing *Dunlap*, 527 F.2d at 401).

The first factor is not in dispute. (*See* Doc. #90 at 7). The second two are. U.S. Pipe argues that the company only recently began requiring employees to wear greens, that nothing in the pipe manufacturing process has changed necessitating the wearing of the greens, and that Plaintiffs admit that the greens benefit their own health and safety. (*See* Doc. #76 at 38, n. 58). Those facts are not in dispute. But they are easily refuted, as Plaintiffs have successfully done here, pointing to valid disputes of fact as to whether the PPE is necessary to perform work in the melting and casting

departments, and whether the wearing of the greens primarily benefits U.S. Pipe or the employees.[27]
(*See* Doc. #84 at 40-49) ("[T]hat USP only recently obligated its employees to wear the greens
reflects upon the defendant's tardy negligence in implementing the requirement, not upon the long-
time necessity for the equipment;" OSHA "obligate[s] and compel[s] USP to require its employees
working in the Melting and Casting areas to wear the greens;" "It may be reasonably inferred that
USP provides the greens to satisfy OSHA's general duty clause;" "A U.S. Pipe corporate
representative testified that molten metal exposure is a recognized hazard in the industry that is likely
to cause death or serious physical harm to the employees in the Casting and Melting departments,
and for this reason the company requires those employees to wear the greens;" "[T]he nature of the
plaintiffs' work depicts the necessity of wearing the greens to perform their duties;" "[T]he
defendant failed to acknowledge the benefits it enjoys in requiring their employees to wear the greens
and other protective equipment.").

 These remaining questions are properly left for a jury to decide.  As to the issue of
compensability for walking time, Defendant's motion for summary judgment is due to be denied.

## V. Conclusion

 For the reasons asserted above, Defendant U.S. Pipe's Motion for Summary Judgment (Doc.
#74) is due to be granted in part and denied in part.  A separate order will be entered dismissing
claims for compensation related to donning and doffing.  The following claims remain in this case:
claims for compensation related to the travel time employees incur (a) after donning the fire-suit and
before arriving at his assigned work location so that he may clock in for work, and (b) before doffing
the fire-suit.

---

[27] Of course, there also remains a disputed fact as to whether employees have the option to
don and doff PPE at home.  *See* footnote 6, *supra*.

**DONE** and **ORDERED** this _____21st_____ day of August, 2009.

_____
**R. DAVID PROCTOR**
UNITED STATES DISTRICT JUDGE